# Hornsby *v.* The State.

### *Indictment for Murder.*

1. *Drawing special jurors, under local law.*—Under the local law of force in Pike county (Sess. Acts 1888-9, p. 430), the names of persons from whom jurors are to be selected are required to be deposited, not in a single box, as under the general law, but in fifteen boxes, one for each precinct in the county; and in drawing jurors for a special *venire*, it is a proper practice for the judge to draw one name from each box in rotation.

2. *Alternative averments in indictment.*—Under statutory provisions, when the offense charged may be committed by different means, or with different intents, such means or intents may be alleged in the same count in the alternative (Code, § 4383); but, when such alternative averments are employed, each alternative must charge an indictable offense, in language legally sufficient.

3. *Same; objections on account of insufficient averments.*—An indictment which contains alternative averments, one of which is legally insufficient, is demurrable on that account; but, after a general verdict of guilty, the defect is not available on motion in arrest of judgment.

| 94 | 55 |
| 94 | 14 |
| 94 | 55 |
| 95 | 2 |
| 95 | 23 |
| 94 | 55 |
| 96 | 10 |
| 94 | 55 |
| 98 | 6 |
| 98 | 18 |
| 98 | 80 |
| 94 | 55 |
| 99 | 192 |
| 94 | 55 |
| 104 | 27 |
| 94 | 55 |
| 106 | 11 |
| 106 | 61 |
| 107 | 21 |
| 107 | 57 |
| 107 | 129 |
| 110 | 36 |
| 94 | 55 |
| 112 | 67 |
| 94 | 55 |
| 117 | 195 |
| 119 | 5 |
| 119 | 6 |
| 94 | 55 |
| 126 | 50 |
| 94 | 55 |
| 128 | 26 |
| 128 | 57 |
| 94 | 55 |
| 129 | 40 |
| 94 | 55 |
| 134 | 196 |
| 94 | 55 |
| 136 | 30 |
| 137 | 50 |

[Hornsby v. The State.]

4. *Indictment for murder "by stabbing with knife or other weapon."* An indictment for murder containing a single count, which charges that the defendant killed the deceased "by stabbing him with a knife or *other weapon,"* is demurrable on account of the insufficiency of the latter alternative averment; but, if no demurrer is interposed, and a general verdict of guilty is rendered, the defect is not available on motion in arrest of judgment.

5. *Preliminary examination of juror.*—On the preliminary examination of a juror in a criminal case, the defendant being a negro, he can not require the court, as matter of right, to ask the juror "whether he is willing to accord to a negro as fair a trial as he would to a white man."

6. *Confessions,* voluntary made, are not inadmissible as evidence because made while defendant was under arrest; nor because they were made to the officer who had him in custody, and who had a pistol in his hand; especially where, as in this case, the statements are exculpatory rather than criminating.

7. *Admission of implements as evidence.*—On a trial for murder, the evidence for the prosecution tending to show that the deceased was killed by a stab or cut in the neck by the defendant, while they were riding home together in a wagon, and the evidence for the defendant tending to show that he fell out of the wagon, and was struck in the neck by the sharp point of a broken spoke in one of the wheels; the spoke being put in evidence before the jury, in connection with evidence that the bloody point had been blunted by rats gnawing it, the admission of another piece of wood is not allowable in connection with evidence of its similarity in shape with the broken spoke before the rats had gnawed it.

8. *Murder in first degree; charges as to.*—A "formed design" to take life is not the equivalent of the "deliberation and premeditation" which are elements of murder in the first degree, but may exist in a case of self-defense, or excusable homicide; and a charge which uses the terms as synonymous, or of equivalent meaning, is not correct.

9. *Use of deadly weapon as raising presumption of malice.*—In a case of homicide, a presumption of malice arises from the use of a deadly weapon, unless the evidence which proves the killing rebuts that presumption; but, when the evidence is entirely circumstantial, and the jury might legally infer from any of the facts relied on to sustain the charge of murder that the defendant acted in self-defense, or under sudden passion engendered by sufficient provocation, it is error to charge the jury as to the presumption of malice from the use of a deadly weapon, without adding the qualifying phrase, "unless the evidence which proves the killing rebuts the presumption."

10. *Charges as to reasonable doubt*—as, that it must be "actual and substantial, and not mere possibility or speculation;" or, that the expressions, "unless the evidence against the defendant is such as to exclude to a moral certainty every hypothesis but that of his guilt;" or, "the evidence should be so convincing as to lead the minds of the jury to the conclusion that he can not be guiltless, only mean that the jury must be convinced beyond a reasonable doubt," are correct, and are properly given.

11. *Same.*—Charges requested, which, conceding "no reasonable doubt" of the killing, yet make the grade of the offense dependent on "a doubt" of the particular facts, are properly refused.

12. *Manslaughter in first degree.*—A charge instructing the jury that "manslaughter in the first degree is the voluntary depriving a human being of life," does not contain a proper definition of that offense, and is properly refused

13. *Proof of malice; charge as to.*—The prosecution may always adduce evidence of a motive for the commission of the offense charged,

but is not bound to prove a motive when the commission of the offense is clearly made out by other evidence; and the court may properly refuse to charge the jury, on request, that the absence of all proof of motive "affords a strong presumption of innocence."

14. *Argumentative charges* are properly refused, without regard to the correctness of the legal propositions involved.

FROM the Circuit Court of Pike.

Tried before the Hon. JOHN P. HUBBARD.

The defendant in this case, Lige Hornsby, a negro, was indicted for the murder of Jere Perdue, another negro, "by stabbing him with a knife or other weapon;" was convicted of murder in the second degree, and sentenced to the penitentiary for the term of 15 years. Before entering on the trial, the defendant moved to quash the special *venire* which had been summoned, but the record does not show that any exception was reserved to the overruling of this motion. As each juror was examined by the court on his *voir dire*, the defendant requested the court to ask him "if he was willing to accord to a negro as fair a trial as if he was a white man;" and he excepted to the refusal of the court to do so. The evidence adduced on the trial showed that the defendant and the deceased lived on the plantation of Col. Perdue, and went together to Troy on the day the deceased was killed; that they started home together in a wagon, sitting on the same board, the defendant driving, and the deceased sitting on his left; that the deceased was drunk, or had been drinking; that they stopped on the suburbs of the town, and the defendant bought two boxes of sardines, one of which he gave to the deceased; that the deceased was afterwards seen with a knife in his hand, eating sardines out of the box; that about eight miles from town, as they were passing a gentleman's house, "deceased was muttering something to himself, when defendant told him to hush, that they were passing a white man's house;" that afterwards, when they were about a mile from Col. Perdue's place, a man who was working in a field near the road, about 250 yards distant, heard the noise of the wagon coming down the hill, and when the noise ceased, heard some one say, "O, damn you, don't throw me out;" and this witness further testified that the defendant, "shortly afterwards, drove by him in a trot, whipping his mules, and the deceased was not in the wagon." The dead body of the deceased was found lying in the road near that place, by Col. Perdue, who testified that the defendant, on reaching home in the wagon, "told him that a man had got tangled up in the wagon wheel, and he [Perdue] had better go down and see about him—that he did not know how badly he was hurt." Col. Perdue went to the place at

once, and found the body lying in the road, with wound in the neck which had severed the carotid artery. The physician who examined the body testified that the wound was made by a cut or stab with a sharp instrument, as the edges were "clean and smooth, not rough or jagged."

"The evidence tended to show that the defendant fled when the officer went to arrest him the next morning, but the officer drew a pistol on him as he ran, and caught and carried him back to the house where his mother was living; that he refused to let him go into the house to get his coat, but told him his mother might bring it to him; that while he was sitting on the steps, waiting for his coat, and while he was so in the custody of the officer, who was holding a pistol in his hand, but not threatening nor pointing it towards defendant, but only holding it in his hand, defendant made a statement to him, to the effect that the deceased fell out of the wagon, and stuck a broken spoke in his neck; and that the defendant took from his pocket a blunt-pointed knife, but said it was not the knife he had on the preceding evening." The officer testified, also, "that he made no threats and no promises, to induce the defendant to make a statement." The court admitted the defendant's statements to the officer as evidence, against his objection and exception.

"The evidence tended to show, also, that the left front wheel of the wagon had a broken spoke, one end of which was fastened in the hub, while the other end extended within about six inches of the rim of the wheel; that this wheel was very bloody, particularly the broken spoke, and blood was spattered over all the front part of the wagon body, and also in the road for about thirty steps. Col. Perdue testified, that he saw no blood on defendant when he came home, and found none in the body of the wagon. The broken spoke stood upright, but inclined inward, and was not in line with the others, the wheel dishing out from the body as usual where wheels have been in use several years. As to whether the broken spoke ran up to a smooth edge, or whether the point was blunt at the time, the evidence was conflicting. Col. Perdue cut out the spoke, and it was introduced as evidence by the State; but the evidence was conflicting as to whether the point still remained in the same condition as at that time. A witness who testified that he examined the spoke at the preliminary trial, before it was cut out of the wheel, said that he noticed the spoke ran out to a sharpe edge, and called Col. Perdue's attention to it, and asked him to preserve the spoke. The court excluded the latter part of this evidence, on objection by the State, and the defendant excepted. Col. Perdue testified

that, when he had the spoke cut out of the wheel, he wrapped it in paper, and put it up on a shelf in a store at Spring Hill, and that the rats had gnawed the point, which was bloody. The defendant offered in evidence a piece of wood which was cut, in connection with evidence of its similarity to the broken spoke at the time referred to. The court excluded it as evidence, on objection by the State, and the defendant excepted."

The above being "substantially all the evidence," the court charged the jury, "among other things, as follows: · Murder in the first and second degree differ, in that in murder in the first degree there must be deliberation and premeditation, whereas in murder in the second degree these elements of deliberation and premeditation, or formed design, are wanting; murder in the first degree being more atrocious than murder in the second degree, by reason of deliberation and premeditation." The defendant excepted to this charge, and also to each of the following charges, which were given by the court at the instance of the State: (1.) "If the jury believe from the evidence, beyond a reasonable doubt, that the defendant killed John Perdue with a deadly weapon, it is presumed to be murder; and it devolves on the defendant to reasonably satisfy the minds of the jury by evidence that he is guilty of a less crime, or acted in self-defense." (2.) "The expressions, that the jury must find the defendant not guilty 'unless the evidence against him should be such as to exclude to a moral certainty every hypothesis but that of his guilt of the offense imputed to him;' and that 'the evidence for the State should be so convincing as to lead the minds of the jury to the conclusion that the accused can not be guiltless,' are but strong expressions of that full measure of proof which the law exacts before it will sanction a conviction of a criminal offense, all of which only means that the jury must be convinced beyond a reasonable doubt." (3.) "The doubt which requires an acquittal must be actual and substantial, not mere possibility or speculation: it is not a mere possible doubt, because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt."

The defendant requested the following charges in writing, and duly excepted to their refusal: (1.) "If the jury have no reasonable doubt that the defendant took the life of the deceased, but are in doubt whether the act done was a deliberate, premeditated act, or the result of heat of blood excited by an attack made or threatened by the deceased, their finding must be manslaughter in the first degree." (2.) "Manslaughter in the first degree is the voluntary depriving a human being of life." (2.) "The plea of not guilty puts in issue every con-

stituent of the crime of homicide; and although the jury may not know, or be satisfied beyond a reasonable doubt, how the death of the deceased was brought about, yet, if they are not satisfied beyond such doubt that the defendant did the act with premeditation, they can not convict him of either degree of murder." (4.) "In criminal prosecutions, the weight and sufficiency of the evidence are for the jury. The guilt of the accused should be fully proved, and it is not enough that the weight of the evidence points to his guilt: it must do more—it must point to his guilt with such force and certainty as to exclude every reasonable hypothesis of innocence. Circumstances may point to a party accused, may create suspicion of his guilt, and there may be no explanation of them; still they may fall far short of producing that satisfied conviction which leaves on the mind no reasonable doubt. The burden is on the State to prove the guilt of the accused, and is not necessarily on the defendant to explain suspicious circumstances. Suspicion, without more, is not enough: conviction beyond a reasonable doubt is what the law requires." (5.) "If there is all [an?] absence of all evidence of any inducing cause to guilt, that is, a motive, it affords a strong presumption of innocence." (6.) "The supposition of guilt should flow naturally from the facts proved, and be consistent with them all. The jury should make an examination of all the facts of the case, free from bias or prejudice, and an examination of the case on both sides, in its aspects of favor or disfavor; should avoid precipitancy or haste in drawing their inferences, and resist any tendency to jump at conclusions without examining all the facts of the case, and allowing them every interpretation which they will reasonably admit of. The process of coming to a conclusion is to be a natural one, without the use of any mental violence in straining facts beyond their real significance. If any of the facts or circumstances established by the evidence be absolutely inconsistent with the supposition of guilt, the jury must acquit." (7.) "The defendant can not be convicted of the higher degree charged in the indictment, unless the jury are convinced beyond a reasonable doubt that he took the life of the deceased intentionally, and with premeditation and deliberation; and if they are satisfied beyond a reasonable doubt that the deceased came to his death at the hands of the defendant, but are in doubt whether the death was occasioned by the deliberate act of the defendant, or was done accidentally, they must acquit."

GARDNER & WILEY, for appellant, argued each of the points reserved, and cited *Wilson v. State*, 84 Ala. 426; *Phillips v.*

*State*, 68 Ala. 469; *State v. Dame*, 35 Amer. Dec. 495; *Shepherd v. State*, 54 Ind. 26; *Com. v. Webster*, 5 Cush. Mass. 295, or 52 Amer. Dec. 729; *Adams v. State*, 10 So. Rep. 106, Florida; *Wharton v. State*, 73 Ala. 366; Bur. Cir. Evidence, 736, 2d ed.

WM. L. MARTIN, Attorney-General, for the State.—(1.) There was no error in refusing to ask jurors questions touching their qualifications, not prescribed by statute.—*Hawes v. State*, 88 Ala. 37; *Lundy v. State*, 91 Ala. 100; *Bales v. State*, 63 Ala. 38. (2.) The defendant's statements to the arresting officer, touching the homicide, whether amounting to confession or denial of guilt, were properly admitted as evidence. *Dodson v. State*, 86 Ala. 60; *Spicer v. State*, 69 Ala. 159; *Marks v. State*, 87 Ala. 99; *Maxwell v. State*, 89 Ala. 150. (3.) The distinction between the two degrees of murder was correctly stated in the general charge of the court.—*Mitchell v. State*, 60 Ala. 26. (4.) As to the three charges given at the instance of the State, see *DeArman v. State*, 71 Ala. 351; *Coleman v. State*, 59 Ala. 52; 3 Brick. Digest, 316, § 524. (4.) Of the several charges asked and refused, the 1st, 3d and 7th, each, erroneously assumes that premeditation is an essential element of murder in the first degree.—*Mitchell v. State*, 60 Ala. 26. The 2d was abstract, and properly refused on that account.—*Reese v. State*, 90 Ala. 624. The others are argumentative, misleading, and invade the province of the jury. (5.) The overruling of the motion in arrest of judgment is not revisable, because no exception was reserved to it. *Robin v. State*, 40 Ala. 72. (6.) But the motion was properly overruled on its merits. Under statutory provisions (Code, § 4383), alternative averments are permitted in an indictment to take the place of several counts; and each alternative must state an indictable offense, in language which would be sufficient in a separate count.— *Wilson v. State*, 84 Ala. 426; *Dismukes v. State*, 83 Ala. 287; *Horton v. State*, 53 Ala. 488. If an indictment contains good and bad counts, a general verdict of guilty will be referred to the good counts, and the conviction will be sustained.—*Rowland v. State*, 55 Ala. 210; *Glenn v. State*, 60 Ala. 104; *May v. State*, 85 Ala. 14. The same principle is applicable to alternative averments in a single count.

COLEMAN, J.—The defendant was arraigned upon an indictment for murder; to which he pleaded not guilty. Afterwards, but before the day fixed for his trial, he filed a plea to the effect that the special *venire* was drawn from fifteen dif-

ferent boxes, and not "a single box" as required by law. The proper way to reach a *venire* not drawn in accordance with law, is by a motion to quash the *venire*. There was no ruling of the court upon this plea, and the record fails to show that the attention of the court was called to it. Pretermitting the fact that there is no ruling to which an exception was taken, or legal question is reserved, upon this point (*Ex parte Knight*, 61 Ala. 486), we are of opinion the *venire* was properly drawn. Section 4 of the act of 1886-7, p. 151, which provides that jurors shall be drawn from a box, was amended by the act of 1888-9, p. 430, so far as it applied to Pike county. By the latter act, it is provided that the name of the persons from whom the jurors are to be drawn shall be placed in fifteen boxes—one box for each precinct in the county. The fifteen boxes are here clearly substituted for the one box mentioned in the original act, and it must be so regarded when a jury is to be drawn for the trial of a capital case as provided in section 10 of the act. The record shows the special *venire* was drawn according to law.

The indictment charges that the defendant unlawfully and with malice aforethought killed Jere Perdue, by stabbing him with a knife, or *other weapon*, against the peace and dignity of the State of Alabama. Section 4383 of the Code provides, "When the offense may be committed by different means, or with different intents, such means or intents may be charged in the same count in the alternative." In the case of *Horton v. State*, 53 Ala. 493, it was declared that the purpose of the statute is to dispense with a multiplicity of counts, permitting one, by alternative averments of different offenses, to serve the purpose of several counts. It follows that each alternative averment must present an indictable offense, or the indictment is insufficient, as at common law, the separate count, not presenting an indictable offense, would be bad. We think this to be a correct exposition of the statute, which permits the averments in the alternative, in one count, of the means by which an offense may be committed.—*Burdine v. State*, 25 Ala. 60.

The indictment must be examined under the rules of the common law, as if it contained two counts, the first charging that the offense was committed by stabbing with a knife; and the second, by stabbing with a weapon. The first count undoubtedly would be sufficient. Is there such a description of the means in the second as to make it a good count? At common law, it was necessary to set forth in an indictment for murder the means by which the offense was committed, and if by a weapon, it was necessary to say what the weapon

[Hornsby v. The State.]

was, or allege it to be unknown by the grand jury.—2 Bishop on Criminal Pro., § 514; 1 East Pl. Cr. 341. The form given in the Code retains a description of the means used, as by shooting him with a pistol or gun, or by striking him with an iron weight, &c. Section 4378 provides that, when the means are unknown, it may be so averred in the indictment. We hold that the alternative averment, "or other weapon," insufficiently describes the means used, and rendered the indictment demurrable.

Instead of demurring to the indictment, the defendant pleaded not guilty, and after conviction moved in arrest of judgment, upon the ground that the indictment was defective. We are of the opinion that the particular defect complained of is not available on motion in arrest of judgment; but to be available, advantage must be taken of the defect before trial and conviction. The authorities are uniform, and on principle must be correct, that averments in the alternative in one count are mere substitutes for so many different counts. The validity of such forms is maintainable, in a great measure, upon this principle. As was held in *Burdine v. State*, 25 Ala., *supra*, the defendant is as well informed when he is charged in the alternative, as if he had been charged in different counts; and it is upon this principle that each alternative averment must present an indictable offense. In the case of the *State v. Coleman*, 5 Por. 284, it was stated, that "it seems now well settled, that when there is a verdict and judgment on an indictment with good and bad counts, the judgment shall not be arrested or reversed, but the finding of the jury will be upheld by the good counts.. For it will be presumed that the court, and of consequence the jury, were controlled in their actions by a reference to the good counts." This ruling of the court has been uniformly approved.—1 Brick. Dig. p. 501, § 761; *May v. State*, 85 Ala. 16; *Glenn v. State*, 60 Ala. 104. It would seem to follow from these authorities, that when a count is in the alternative, with some of the averments good, and others charged in the alternative are bad, and no objection is taken to the indictment, a general verdict will be referred to the good averments, and a judgment on conviction will be sustained. Under any other rule, no attorney of any skill would interpose a demurrer or other objection when an indictment was defective, by reason of having bad counts or insufficient averments. He would simply take the chances of acquittal, and, failing in this, would move in arrest of judgment, and thereby secure the discharge of the defendant, or a new trial. To sustain a judgment of conviction, there must be a good count in the indictment; or, if there is but one count

containing charges in the alternative, there must be one or
more good and sufficient averments.   There may be some de-
cisions not altogether consistent with the rule here laid down;
but we think this the better practice, and in harmony with
the principles of law declared in the cases cited *supra*.

There is no rule of law which authorizes the defendant to
inquire of a person summoned as a juror, upon his *voir dire*,
whether he was willing to accord to a negro as fair trial as he
would to a white person.   The statute lays down the rule for
ascertaining the qualifications of jurors, and the cause of chal-
lenge.   As was said in *Bales v. State*, 63 Ala. 38, "We know
of no authority, and we perceive no reason for any such spec-
ulative, inquisitorial practice, consuming needlessly the time
of the court, and offensive to the persons subjected to it."   The
rule is ancient, that neither party has a right to interrogate a
juror before he is challenged.—*Hawes v. State*, 88 Ala. 66;
*Lundy v. State*, 91 Ala. 100.

The statement of the defendant in regard to the killing, and
how it occurred, seems to have been wholly voluntary.   The
fact that he was under arrest, and that the officer who had
him in charge was armed, alone are not sufficient to exclude
such statements.   There must be some improper influence
proceeding from the person to whom the confession was made,
or from some other person, or arising from the surrounding
circumstances, to exclude the statement of a defendant upon
the ground that they were not freely and voluntarily made.
The mere fact of arrest, and his being guarded by an officer
who is armed, is not sufficient.   The statements of the defend-
ant, if true and believed, moreover tended to exculpate, and
not to criminate him.—*Redd v. State*, 69 Ala. 259; *Spiers v.
State, Ib.* 163; *Meinaka v. State*, 55 Ala. 47; *Dodd v. State*,
86 Ala. 63.

There was no error in sustaining an objection to the intro-
duction of the piece of wood, claimed to be similar in shape
to the wagon-spoke as it was said to be when the homicide
occurred.   The wagon-spoke itself was in evidence, and if its
appearance from any cause differed from what it was at the
time of the death of deceased, this was a matter of proof.   To
permit the introduction of another piece of wood, and evidence
to show its similarity, merely presented a collateral contro-
verted issue, calculated to confuse the jury and draw their
minds from the main issue.   The conversation between the
witness and Col. Perdue, in regard to the shape of the spoke,
was mere hearsay, and properly excluded.

The definition of murder in the first degree given by the
court in its general charge is not, as an abstract proposition of

[Hornsby v. The State.] .

law, absolutely correct.  As we interpret the charge, it holds that whenever there is a formed design to take life, and life is taken in pursuance thereof, that will constitute the offense of murder in the first degree, without regard to other facts in the case.     There may be a formed design to take life, by one acting entirely in self-defense.  If a party is without fault in provoking a difficulty, if there is no reasonable way open to him to retreat and escape, and if the assault upon him is of such a character as to endanger his life, or such as to impress a reasonable man that to save his own life it is necessary to strike, he may strike in self-defense, and with the formed design to take ,life, and if death to his assailant ensues, under such circumstances, it will be excusable homicide.  No particular duration of time for the existence of formed design is necessary to raise the offense to murder, when the formed design is the product of malice, premeditation, deliberation, and not engendered by passion suddenly aroused, upon sufficient provocation, or the necessities which justify a striking in self-defense.

The law does not require one to retreat from his own castle. In law, his castle is the wall, the limit of retreat.  He may take life with a formed design here in resisting assault apparently dangerous to his life or limb, or in the necessary protection of his dwelling; and it may be excusable homicide, although under like circumstances, at another place, he would be bound to retreat, and failing to do so, he would not be excusable.—*Lee v. State*, 92 Ala. 19.  An officer of the law, having a writ to execute, having reasonable grounds to apprehend resistance, may in some cases arm himself, with the formed design to take life if it becomes necessary in the discharge of the duties imposed upon him by law.  In some cases, a person is justified in taking life to prevent the commission of a felony, although done with a formed design.

A person guilty of manslaughter may have instantaneously formed the design to take life, but, to make it manslaughter, there must be an absence of malice, deliberation and premeditation.   The design in such case is the result of sudden passion upon sufficient provocation, as distinguished from that formed design which results from malice, deliberation, premeditation.   As was said in *Harrington v. State*, 83 Ala. 15–16, and re-affirmed in *Williams v. State, Ib.* p. 17, "In order to constitute manslaughter in the first degree, there must be either a *positive intention* to kill, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily injury may be a consequence."   It is difficult to conceive how there can be a "*positive intention*" to kill with-

3

[Hornsby v. The State.]

out forming the design to kill, and such "positive intention" necessarily precedes the killing. Whether the "design," or "positive intention," is the offspring of the elements which constitute murder in the first degree—that is, "willful, deliberate, malicious, and premeditated"—or the facts which constitute murder in the second degree, or of sudden passion upon sufficient provocation, or in self-defense, is always a question of fact for the jury, under proper instructions of the court. This is the proper meaning and full extent of the law as declared in the leading case of *Mitchell v. The State*, 60 Ala. 26, when correctly construed.

It is undoubtedly a canon of the law, that "if one man intentionally shoot another with a gun, or other deadly weapon, and death ensues, the law implies or presumes malice;" and we may add, a "formed design" to take life; and it imposes upon the slayer the burden of rebutting this presumption by other proof, *unless the evidence which proves the killing* rebuts the presumption.—*Hadley v. State*, 55 Ala. 37; *Mitchell v. State*, 60 Ala. 28; *Gibson v. State*, 87 Ala. 121. Whenever there are any facts testified to on a trial for murder, and which are necessary and are relied upon to sustain the charge of murder, and a jury could legally infer from the facts proving the offense that the defendant acted in self-defense, or the homicide was the result of sudden passion engendered by sufficient provocation, and without malice, it is error to charge the jury as to the presumptions arising from the use of a deadly weapon, without accompanying such charge with the further statement, "unless the evidence which proves the killing rebuts the presumption." When the facts which prove the killing, do not tend to rebut the presumption which the law raises from the use of a deadly weapon, then it becomes incumbent on the defendant by other evidence to rebut the presumption, and failing to meet this burden the presumptions of law are conclusive against him.—*Hadley v. State, supra*. Although the jury may have discredited the account given by the defendant as to the means by which the deceased came to his death, and although they may have been satisfied that his statements in this respect were unreasonable, this would not deprive the defendant of the benefit of the evidence in the case, whether introduced by the State for the purpose of criminating him, or by himself as exculpatory evidence. It is upon the whole evidence the jury must make up their verdict. *Smith v. State*, 68 Ala. 430–1. It would be improper, perhaps, for this court to make special reference to any particular portions of the evidence; but we think, when the evidence sustaining the charge is wholly circumstantial, and the char-

[Hornsby v. The State.]

acter of the wound causing death tends to show that it was done by cutting or stabbing, and the relations of the parties to each other existing as shown in this case, the safer rule is to charge on the law of manslaughter, and to let the jury say whether there are facts which would reduce the crime to a lower degree than murder.—*Hall v. State*, 40 Ala. 706.

There was no error in giving the second and third charges requested by the solicitor.—*Coleman v. State*, 59 Ala. 52.

The first and seventh charges requested by the defendant exact too high a degree of conviction in the minds of the jury of the guilt of the defendant. The law does not require that the jury be satisfied beyond all doubt.

The definition of manslaughter in the first degree, contained in the second charge requested by the defendant, is erroneous, and was properly refused. It omits the important qualifying clauses, "unlawful," and "without malice." The statute does not attempt to define manslaughter, and we must look to the common law for its definition.—*Smith v. State*, 68 Ala. 430; 3 Brick. Dig. 218, § 560.

Premeditation is not necessarily a constituent of murder in the second degree. As was said in *Ex parte Brown*, 65 Ala. 447–8, "if there be a killing without previous malice, provoked by abusive language, or other offense less than an immediate preceding assault, and the insulted party, maddened by the insult, immediately and without reflection, without time to reflect, and with no purpose formed or thought of, take life with a deadly weapon, this reduces the crime to murder in the second degree; but it reduces it no lower." The statute itself (Code, § 3727) declares that killing in a sudden rencounter, by the use of a deadly weapon concealed, his adversary having none, under certain circumstances is murder in the second degree. There was no error in refusing this charge.

Charge five, requested by the defendant, is misleading, and asserts an incorrect proposition of law. It is always permissible for the State to prove facts which tend to show a motive for the commission of the offense. Such evidence assists in fixing the crime upon the proper person, and in some cases is strongly instrumental in determining the degree of the offense; but, if the offense be clearly made out by other evidence, it is not incumbent on the State to go further, and also prove a motive. A person who deliberately shoots and kills another with a deadly weapon, without excuse, whom he never heard of or saw before, may be guilty of murder, although there may be an entire absence of proof of motive. Under such a rule as asserted in the charge requested, the very atrocity of the offense would be made to furnish a presumption of innocence.

[Mitchell v. The State.]

The fourth and sixth charges are misleading and argumentative in their character. Courts and text-writers often precede their conclusions by just reason and sound argument, to sustain them; but when copied into a charge to a jury, would confuse and mislead. This court never reverses for refusing to give a charge of this character.—*Tanner v. State*, 92 Ala. 8.

For the error pointed out in the first charge given at the request of the solicitor, the case is reversed, and the cause remanded.

Reversed and remanded.